IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MICHAEL A. GULLY                                                      PLAINTIFF

v.                                      Case No. 2:12-CV-02077

AETNA LIFE INSURANCE COMPANY                                          DEFENDANT

## OPINION AND ORDER

Plaintiff Michael A. Gully brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging Defendant Aetna Life Insurance Company ("Aetna") wrongly denied his claim for long-term disability benefits. Before the Court are the Administrative Record (Docs. 9-12), Plaintiff's brief (Doc. 14), and Defendant's brief (Doc. 15). For the reasons stated herein, the Court finds that Defendant's decision to deny benefits is REVERSED and REMANDED to the plan administrator for further consideration consistent with the reasoning in this opinion.

### I. Background

From 1997 until November of 2008, Michael A. Gully worked as a heavy equipment operator for American Asphalt & Grading Company ("AAG") in Las Vegas, Nevada. His only jobs prior to his employment with AAG involved operating heavy machinery. He also served in the United States Marine Corps and earned a GED while in service.

During the approximately ten years that Gully worked for AAG, he was enrolled in his employer's group policy of short-term and long-term disability insurance issued by Aetna. Under the insurance plan, disability payments for a period up to 24 months were payable when an employee was deemed "not able to perform the material duties of [his] own occupation solely

-1-

because of disease or injury; and [his] work earnings are 80% or less of [his] adjusted predisability earnings." (Doc. 9-2, p. 4). After 24 months of disability payments, an employee would only be eligible to receive further benefits if deemed unable to work "at any reasonable occupation solely because of: disease; or injury." *Id.* According to the plan, a "reasonable occupation" is "any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 60% of your adjusted pre-disability earnings." *Id.* at p. 18. Gully's salary prior to applying for disability benefits was $62,400 annually, or $5,200 per month.

In October of 2008, Gully was diagnosed with osteoarthritis in both knees. On October 31, 2008, an MRI revealed that Gully suffered from degenerative changes and effusion (abnormal accumulation of joint fluid) in both knees, and Gully was restricted by his doctor to light-level work for four hours per day from November 6, 2008, through November 16, 2008. However, November 6, 2008, was the last day Gully reported to work at AAG. He applied for short-term disability benefits under the group plan and began receiving benefits on November 14, 2008.

On December 22, 2008, Gully was examined by a physician's assistant, Thomas Miller, who filled out a statement for AAG, claiming Gully was unable to return to work due to back and knee pain, as well as prostate cancer, which had recently been diagnosed. Gully then saw an orthopaedic surgeon, who recommended that he undergo knee arthroplasty surgery. Gully declined to proceed with the surgery, and injection therapy was provided to him instead. Short-term disability was approved through February 12, 2009, and Gully's claim for long-term disability was then transferred to Aetna, the plan administrator, for review.

Aetna approved Gully's claim for the initial 24-month period of disability as of February 5,

2009, and benefits were authorized through February 5, 2011.  Gully underwent radiation therapy for prostate cancer on April 10, 2009, and after that, an abdominal x-ray from July 2009 showed that Gully's prostate was essentially normal.  Later, during a July 10, 2009, follow-up visit, Gully's doctors reported that Gully had recovered well from the radiation therapy.

Gully successfully petitioned for Social Security disability benefits effective May 1, 2009.  Per Aetna's policy, his monthly short-term disability checks under the group plan were offset by his Social Security checks.  About a year later, in June of 2010, Gully moved from Nevada to his current residence in Ratcliff, Arkansas, where he began receiving medical care from Dr. Pamela Cobb at the Veteran's Administration Medical Center ("VA") in Fayetteville, Arkansas.

On August 12, 2010, Gully saw Dr. Jennifer Craig at the VA, who noted "adequate" range of motion in his knee joints, no tenderness, and no joint effusion.  X-rays of Gully's knees on August 13, 2010, showed moderate osteoarthritis and narrowed joint spaces.

On September 8, 2010, Gully saw Dr. Banford R. Mitchell, an orthopedist, who remarked that Gully's left knee area was already "bone-on-bone" and that his right knee was "nearly so." (Doc. 12-1, p. 5).  Dr. Mitchell also noted that Gully had a "marked varus [inward] deformity, especially on the left side while standing." (Doc. 12, p. 7).  Even so, Dr. Mitchell felt that Gully got around "fairly well" and treated Gully's knees with steroid injections.  *Id.*  According to Dr. Mitchell, Gully was not interested in knee replacement surgery at that time and instead preferred to be fitted with knee braces to improve his stability when standing or walking..

On October 21, 2010, Aetna notified Gully by letter that in order to continue to be entitled to long-term disability benefits after February 5, 2011, he would first have to meet the policy's requirement that he be unable to perform "any reasonable occupation" at or above 60% of his pre-

disability salary.  (Doc. 10-1, p. 23).  At that point, Aetna solicited opinions from Gully's treating physicians regarding the current status of his disability.  In December of 2010, Dr. Cobb reported to Aetna that in her opinion, Gully had no ability to work and that his period of disability was indefinite due to multiple health issues, including osteoarthritis in his knees, chronic pain, and a history of prostate cancer.  (Doc. 12-1, p. 34).  Aetna then wrote to Dr. Cobb on January 18, 2011, questioning whether her prescribed limitations regarding Gully were supported.  Dr. Cobb then filled out a questionnaire for Aetna, dated January 28, 2011, in which she clarified that she thought Gully could perform sedentary work, but not light physical-demand work, given his disability.  *Id.* at p. 36.

Aetna hired a vocational counselor named Gayle B. Hope to conduct an assessment of the jobs in the local economy for which Gully may be qualified.  Ms. Hope determined that 60% of Gully's pre-disability salary was $18.43 per hour.  Based on Gully's work history and the reports of his treating physicians, she also determined that he had transferable skills to perform sedentary occupations at the unskilled or semi-skilled level.   Ms. Hope identified three sedentary jobs—Assignment Clerk, Production Clerk/Circulation Clerk, and Repair Order Clerk—that met the geographic and wage criteria needed to qualify as "reasonable occupations" under the long-term benefits plan.  (Doc. Doc. 12-1, pp. 39-41).   These three jobs reportedly carried with them a "mean wage of $19.21 per hour."  *Id.* at p. 41.  She further explained that "[s]ome learning of essential job duties is likely to be needed" with these jobs, as Gully had no directly transferrable skills, and that "[s]hort-term on-the-job training may be appropriate."  *Id.* at p. 40.  With all of these jobs, however, she noted that "[c]omputer skills are very important."   *Id.* at p. 41.

On February 25, 2011, Aetna sent Gully a letter informing him that he was no longer eligible for benefits under the policy, as he had not demonstrated that he was unable to perform any

reasonable occupation due to disability.  Gully appealed the denial on August 15, 2011, disputing that any sedentary jobs in the relevant geographic market existed for which he was both qualified and could be paid at least 60% of his pre-disability salary.

Gully hired his own vocational expert, Dr. Michael McKeeman.  In a November 10, 2011 report, Dr. McKeeman agreed with Aetna that Gully was qualified to do sedentary work despite the osteoarthritis in his knees and that sedentary jobs existed in the relevant Las Vegas, Nevada area. (Doc. 12-1, p. 54).  However, Dr. McKeeman disagreed with Aetna's vocational expert, Ms. Hope, that Gully could make at least 60% of his pre-disability earnings performing these sorts of sedentary, clerical jobs.  According to Dr. McKeeman:

> Many of the transferable skills that Mr. Gully does have do not transfer well to a clerical setting.  Thus, he would need to start employment in the lower 10% of the population.  Using the information gleaned from the Bureau of Labor Statistics this would place him at making about $12.73 per hour.  Although over time he might be able to rise to an amount of $19.85 per hour, which is the median of individuals working in those professions, but not the beginning wage, it would take some time for Mr. Gully to rise to that level and it should also be remembered that he is now 58 years of age.

*Id.*

Dr. McKeeman also pointed out that Gully has no knowledge of computers, does not own a computer, and does not know how to type; but computer proficiency was considered "very important," if not a prerequisite, to performing the sedentary jobs identified in Ms. Hope's review of the relevant market as well as Dr. McKeeman's report.  Further, Dr. McKeeman agreed with Ms. Hope that the available sedentary jobs listed "would take one month to six months to learn" and "some of them required prior experience or training."  *Id.*  With that understanding, Dr. McKeeman emphasized that Gully would not be able to start earning the "mean wage" for these jobs that Ms.

-5-

Hope quoted in her report and that Gully would instead expect to earn an "average *beginning* wage of $11.43 per hour." *Id.* at pp. 52-53 (emphasis added).

On February 15, 2012, Aetna sent Gully's counsel a letter informing him that the original decision of February 26, 2011, to terminate Gully's long-term disability benefits was upheld. (Doc. 10-2, p. 48). The letter did not acknowledge Dr. McKeeman's report at all, let alone his determination that the jobs identified by Ms. Hope: (1) required computer skills that Gully did not possess and (2) would not yield salaries that totaled at least 60% of Gully's pre-disability income. After receiving Aetna's determination regarding benefits, Gully appealed the decision to this Court on April 10, 2012.

## II.  Standard of Review

Once a plaintiff in an ERISA action has exhausted his administrative remedies, a reviewing court's function is to examine the record that was before the administrator of the plan at the time the claim was denied. *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A denial-of-benefits claim under ERISA is reviewed for an abuse of discretion when "a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 1997) (en banc) (citing *Firestone*, 489 U.S. at 111). When a plan confers discretionary authority, the court must defer to the determination made by the administrator or fiduciary unless such determination is arbitrary and capricious. *Firestone*, 489 U.S. 115. "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference" because the terms are generally interchangeable. *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008) (citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d

944, 946 n.4 (8th Cir. 2000)).

The plan at issue here states that "Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits . . . ." (Doc. 9-1, p. 33). Gully agrees that the "arbitrary and capricious" standard of review applies to Aetna's decision to deny benefits under the plan. (Doc. 14, p. 2). According to this deferential standard, the decision of the plan administrator may only be overturned if it is not "reasonable, i.e., supported by substantial evidence." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996). An administrator's decision will be deemed reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Id.* "If the decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made." *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (citing *Donaho*, 74 F.3d at 899).

Before turning to a discussion of Aetna's reasons for its denial of benefits, the Court will first address Gully's argument that Aetna abused its discretion by failing to take into consideration the fact that the Social Security Administration deemed Gully to be disabled and decided to award him Social Security disability benefits. Aetna was not required to take the Social Security Administration's decision into account, however, as "an ERISA plan administrator or fiduciary generally is not bound by [a Social Security Administration] determination that a plan participant is disabled." *Jackson v. Metro Life Ins. Co.*, 303 F.3d 884, 889 (8th Cir. 2002) (discussing why determinations of the Social Security Administration are not binding on a plan fiduciary, pursuant to ERISA. Accordingly, it was not an abuse of discretion for Aetna to have come to a different conclusion than the Social Security Administration regarding Gully's eligibility for disability

benefits.

The Court's task now is to analyze whether Aetna's decision to deny long-term disability benefits to Gully was an abuse of discretion.  In considering this question, the Court must examine the basis behind the denial and determine if the decision was supported by substantial evidence.  This evidence should be assessed by its quantity and quality, and this review, "though deferential, is not tantamount to rubber-stamping the result."  *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).

There are five factors the Court will consider to determine whether the decision was reasonable:

> (1) whether the administrator's interpretation is consistent with the goals of the plan;
> (2) whether the interpretation renders any language in the plan meaningless or internally inconsistent;
> (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute;
> (4) whether the administrator interpreted the relevant terms consistently; and
> (5) whether the interpretation is contrary to the clear language of the plan.

*Id.* (citing *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002)).

## III.  Discussion

Pursuant to the Eighth Circuit's holding in *Shelton*, the first factor the Court must consider in evaluating the reasonableness of Aetna's denial of ERISA benefits is whether Aetna's interpretation of the plan was consistent with the goals of the plan. 285 F.3d at 643.  From reviewing the plan's "Long Term Disability Coverage" section, the Court finds that the goal of the plan is to "pay a Monthly Benefit for a period of disability caused by a disease or injury."  (Doc. 9-2, p. 4). However, determining whether an employee is disabled under the plan requires an inquiry into whether the employee meets Aetna's "Test of Disability," which states that, after the first 24 months

-8-

of receiving long-term disability benefits, an employee is only eligible for continuing benefits if he is "not able to work at any reasonable occupation solely because of: disease; or injury." *Id.*

Aetna and Gully agree that the medical evidence supports a finding that Gully is disabled, at least to some degree, due to osteoarthritis in both knees. The parties also agree that Gully's disability is not so severe that it renders him physically incapable of performing sedentary work. It appears the only true area of disagreement in this case centers on whether the nature of Gully's disability renders him unable to work "at any reasonable occupation," as that term is defined in the plan. The "Glossary" section of the plan provides that a "reasonable occupation" is "any gainful activity" for which an employee is "or may reasonably become; fitted by: education; training; or experience; *and* which results in; or can be expected to result in; an income of more than 60% of [the employee's] adjusted predisability earnings." *Id.* at p. 18 (emphasis added).

The only evidence available to the Court in deciding the disputed issue regarding whether "any reasonable occupation" exists for Gully is found in competing labor market reports submitted by Aetna's expert, Ms. Hope, and Gully's expert, Dr. McKeeman. In reviewing these reports, the Court initially observes that "[t]ransferrable skills and labor market studies . . . can constitute substantial evidence supporting a denial of benefits." *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1052 (8th Cir. 2011) (citing *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 805, 808 (8th Cir. 2002). However, such evidence must not be given the "rubber stamp treatment" by the Court simply because a deferential standard of review is required.

In reviewing whether Aetna's decision to deny benefits was supported by substantial evidence, of concern to the Court is the reliability of Aetna's vocational expert's report. Ms. Hope identified several sedentary jobs available in the Las Vegas area that she concluded were "reasonable

occupations" for Gully.  However, in identifying these jobs, she remarked that for all of them, "[c]omputer skills are very important."  She failed to consider whether Gully had any of these "very important" skills.  She also failed to take into account whether Gully could secure the $19.21 per hour "mean wage" for these sedentary jobs if he lacked these skills.  In addition, she failed to analyze whether Gully could reasonably acquire these skills—if indeed such skills were "very important" for these jobs—in a reasonable period of time to secure the "mean wage" of $19.21 per hour.

Given these flaws with Ms. Hope's analysis, the Court next considered the report of Dr. McKeeman, which was submitted to Aetna as part of Gully's administrative appeal.  Dr. McKeeman pointed out in his report his agreement with Ms. Hope that Gully was physically able to perform sedentary work.  He disagreed, however, with Ms. Hope's ultimate conclusion that Gully could obtain a sedentary job at a salary in excess of $18.43 per hour in light of Gully's lack of important technology-related skills.  In particular, Dr. McKeeman stated that he had interviewed Gully and discovered that Gully did not own a computer, had no computer skills, and could not type.  Considering this information, Dr. McKeeman opined that Gully would, at most, be able to obtain an entry level wage at these sedentary jobs that was far lower than 60% of his pre-disability income.  Moreover, there would be no way for Gully to acquire these skills in a reasonable period of time so as to earn the mean wage listed for these jobs.

Aetna correctly points out in its briefing to the Court that it was not required to give Dr. McKeeman's opinions greater weight than Ms. Hope's.  However, it is also true that "[a] plan administrator abuses its discretion when it ignores relevant evidence." *Wilcox v. Liberty Life Assur. Co. of Boston*, 552 F.3d 693, 701 (8th Cir. 2009).  After carefully reviewing the administrative record and the briefing of the parties, the Court finds that it was an abuse of Aetna's discretion as

plan administrator to rely unquestioningly and exclusively on Ms. Hope's report, which contains several relevant, material omissions regarding Gully's qualifications for the jobs Ms. Hope identified as reasonable occupations.  In particular, Aetna should not have relied exclusively on Ms. Hope's report to find that Gully had the capacity to work certain sedentary, clerical jobs in the Las Vegas area, each at an hourly wage exceeding the minimum $18.43 per hour—or 60% of Gully's pre-disability salary—prior to considering whether Gully possessed any computer skills that Ms. Hope identified as being "very important" to doing such work.  Further, Aetna acted unreasonably in relying on Ms. Hope's report when the report itself failed to consider whether Gully's lack of computer skills could be acquired through training or education within a reasonable period of time or whether Gully's lack of skills could, in turn, impact his ability to secure a particular wage.  As Aetna's decision to deny benefits hinged entirely on Ms. Hope's assessment as to the availability of particular kinds of sedentary jobs paying particular wages, Aetna acted arbitrarily and capriciously in summarily concluding that such jobs existed for Gully without considering whether Gully possessed or could reasonably be expected to possess the skills necessary to compete for such jobs and attain such wages within a reasonable period of time.

Considering the Court's findings above, the five *Shelton* factors weigh in favor of Gully and mandate reversal of Aetna's decision to deny long-term benefits.  First, Aetna's decision is inconsistent with the goal of Aetna's long-term disability plan to "pay a Monthly Benefit for a period of disability caused by a disease or injury."  Aetna agrees that Gully is disabled and can, at most, perform only sedentary work; however, Aetna has denied Gully long-term benefits based on a single labor market report that fails to take into account certain relevant, material considerations in its analysis and conclusions.  Therefore, the first *Shelton* factor weights in Gully's favor.

-11-

Second, Aetna's reliance on Ms. Hope's flawed report renders meaningless the plan's definition of "reasonable occupation." The denial or approval of benefits is premised on the plan administrator's reasonable interpretation of the terms of the plan. The question of whether a "reasonable occupation" exists in the relevant market accordingly turns on multiple factors, including an employee's prior work experience and qualifications, the types of jobs available, the potential for training and education, and the types of wages attainable, among other factors. Because Aetna failed to consider whether Gully met the plan definition of "reasonable occupation," Aetna's interpretation of that term was rendered meaningless.

Third, Aetna's decision to deny benefits to Gully conflicts with the substantive requirements of ERISA, as "ERISA requires all plan fiduciaries . . . to discharge their duties in accordance with the plan documents." *Torres*, 405 F.3d at 681. The Eighth Circuit has held that ignoring evidence that is directly related to a benefit plan's definition of a disability violates the requirements of ERISA. *Id.* Here, Aetna ignored evidence set forth in Dr. McKeeman's expert report, when the report properly highlighted the false assumptions, omissions of fact, and improper conclusions formed by Ms. Hope in her report. Under these circumstances, ignoring Dr. McKeeman's report entirely was an abuse of discretion, as was accepting Ms. Hope's conclusions uncritically.

Fourth, Aetna abused its discretion when it failed to interpret the relevant terms in the plan consistently. Aetna contends in its brief to the Court that "Ms. Hope's findings are consistent with the Policy's definition of Reasonable Occupation . . . [because] [t]he Policy contemplates that a claimant may need minimal training in order to become fitted for another gainful occupation that pays 60% of his pre-disability earnings." (Doc. 15, p. 12). The problem with Aetna's position is that it improperly assumes any necessary training will be "minimal," even though Ms. Hope's report fails

-12-

to specifically acknowledge Gully's lack of computer skills or assess the level of training that would be required.  In light of these improper assumptions, Aetna's interpretation of terms is inconsistent.

Finally, fifth, Aetna's reliance on Ms. Hope's flawed report is contrary to the clear language of the plan.  Ms. Hope did not consider certain relevant evidence regarding Gully's current skills and capacity to acquire new skills when concluding that certain available sedentary jobs constituted "gainful activity" for which Gully was "fitted by: education; training; or experience."  Consequently, this factor weighs in Gully's favor.

The proper remedy in this case is to reverse the decision of the plan administrator and remand Gully's claim for further evaluation in light of the opinions and concerns expressed by the Court herein.  Such a remedy is favored by the Eighth Circuit.  *See, e.g.*, *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 1005 (8th Cir. 2005) (observing that under ERISA, courts are afforded the power to return a case to a plan administrator for further consideration).

**IV. Conclusion**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's decision to deny benefits is REVERSED and REMANDED to the plan administrator for further consideration consistent with the reasoning in this opinion.

Judgment will enter contemporaneously with this order.

IT IS SO ORDERED this 31st day of January, 2014.

/s/ P. K. Holmes, III

P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE